IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| BIOIBERICA NEBRASKA, INC., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Case No. 1:18-cv-03133-SAG |
| | * | |
| NUTRAMAX MANUFACTURING, INC., | * | |
| | * | |
| Defendant. | * | |
| | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*

## MEMORANDUM OPINION

Plaintiff Bioiberica Nebraska, Inc. ("Bioiberica Nebraska") filed a one-count Second Amended Complaint against Defendant Nutramax Manufacturing, Inc. ("Nutramax"), seeking to recover fees for late payments Nutramax made to Bioiberica Nebraska under an alleged contract, as well as attorneys' fees and costs incurred in this action. ECF 50. The parties have filed cross-motions for summary judgment, which are currently pending. ECF 86, 87. Nutramax filed both a preliminary opposition and an opposition to Bioiberica Nebraska's statement of material facts, ECF 88, 91, and Bioiberica Nebraska opposed Nutramax's summary judgment motion and its statement of material facts, ECF 90, 93. Both parties replied in support of their respective motions. ECF 96, 97, 98. This Court has reviewed the filings and concludes that the issues presented in these cross-motions are adequately addressed in the parties' briefings, rendering a hearing unnecessary despite Bioiberica Nebraska's request, ECF 99. *See* Loc. R. 105.6 (D. Md. 2021). For the reasons that follow, Nutramax's Motion is granted, and Bioiberica Nebraska's Motion is denied. Judgment will be entered for Nutramax.

1

## I.     FACTUAL BACKGROUND

Bioiberica Nebraska is a subsidiary of, but separate and distinct from, Bioiberica S.A.U., a Spanish corporation located in Barcelona, Spain.  On August 14, 2017, Nutramax sent to Bioiberica S.A.U. a Purchase Order for 18,000 kilograms of chondroitin sulfate ("the Product"). ECF 86-1 ("the Purchase Order").  Nutramax requested that Bioiberica S.A.U. ship the 18,000 kilograms in three installments of 6,000 kilograms each, at a unit price of $97.00 per kilogram, on January 4, 2018, February 5, 2018, and March 1, 2018.  *Id.*  The Purchase Order contained Nutramax's detailed sourcing specifications for the chondroitin sulfate, *id.* at 3-5, as well as Nutramax's proposed terms and conditions, *id.* at 6-8.

The Purchase Order's terms and conditions addressed modification of the Purchase Order:

Any commercial terms on [Bioiberica S.A.U.'s] acceptance, quote, invoice, or other documents or communications are excluded and shall have no force or affect. No modification, amendment, or waiver of any terms herein shall be effective unless in writing and signed by both parties. The course of conduct between the parties may not alter the terms of the [Purchase Order] or these Terms and Conditions.

*Id.* at 6.  The Purchase Order also specified that Bioiberica S.A.U. "shall not delegate all or any portion of its obligations under the [Purchase Order] and/or these Terms and Conditions nor assign any of its rights hereunder, without the prior written consent of NUTRAMAX."  *Id.* at 8.

Bioiberica S.A.U. shipped the first installment to be delivered by early January 2018, *see* ECF 86-12 ¶ 13, and Bioiberica Nebraska sent an accompanying invoice to Nutramax dated January 17, 2018, ECF 86-3.  The Bioiberica Nebraska invoice contained several relevant provisions:

THE FOLLOWING TERMS APPLY TO ALL SALES:  If Customer, for any reason disagrees with these terms and conditions the Customer must reject the goods in a commercially reasonable fashion, subject to a restocking charge. Acceptance of the goods and/or use thereof shall constitute acceptance of the following terms and conditions and the waiver and the release of any terms and conditions not specifically set forth herein.

2

*Id.* at 2.  Two of the invoice's terms dealt with terms set forth in a customer's purchase

order:

> 4.     To the extent that this order is covered by a prior written contract between
>        Bioiberica Nebraska and the Customer, it is accepted on the terms and
>        conditions in that contract and the terms and conditions express [sic] herein
>        are not intended to modify, change, or supersede such prior contract.  To
>        the extent that this order is not covered by such a contract, this instrument
>        contains all of the terms and conditions with respect to the sale and purchase
>        of products named herein . . . .
>
> 5.     The Customer's Purchase Order Number (P.O. No.) set forth above is
>        utilized solely for the Customer's Convenience and internal business
>        records.  The use of this P.O. No. does not indicate any acceptance by
>        Bioiberica Nebraska of the terms or conditions contained in the Customer's
>        purchase order form (which terms and conditions are specifically rejected)
>        and is in no way indicative of the actual sales agreement made between
>        Bioiberica Nebraska and the Customer.

*Id.*  The Invoice further discussed the consequences of a delinquent payment:

> 7.     Payment terms are net thirty (30) days from invoice date unless otherwise
>        agreed in writing . . . . Past due balances are subject to a late payment charge
>        of 1 ½% per month, or the maximum amount permitted by applicable law
>        whichever is less . . . .  Buyer shall pay all reasonable costs, fees (including
>        attorney[s'] fees) and expenses incurred by Seller in collecting monies due
>        or to become due hereunder.

*Id.*

       The remainder of the course of the parties' performance is less immediately relevant to the

resolution of these cross-motions for summary judgment but nonetheless warrant briefly summarizing

here.  Bioiberica S.A.U. did not timely perform its obligation to ship the second installment of

chondroitin by February 5, 2018 because of issues with Spanish customs, and therefore it opted to ship

the remaining quantity of the Product to Nutramax from Bioiberica Nebraska.  ECF 86-12 ¶ 21.  Each

of these subsequent shipments included a copy of the Invoice.  There were, additionally, subsequent

alleged issues regarding the timing, ECF 87-17; ECF 87-18, amount, ECF 87-18, and quality of

Product delivered, ECF 87-16; ECF 87-22, and Nutramax ultimately delayed or withheld portions of

its payments due, ECF 87-22; ECF 87-29.  Nutramax paid the remainder of its amount due following the filing of this lawsuit, ECF 87-30.

## II.     LEGAL STANDARDS

Rule 56(a) of the Federal Rules of Civil Procedure states that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of showing that there is no genuine dispute of material facts.  *See Casey v. Geek Squad*, 823 F. Supp. 2d 334, 348 (D. Md. 2011).  If the moving party establishes that there is no evidence to support the non-movant's case, the burden then shifts to the non-movant to proffer specific facts to show a genuine issue exists for trial.  *Id.*  The non-movant must provide enough admissible evidence to "carry the burden of proof at trial."  *Id.* at 349 (quoting *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315-16 (4th Cir. 1993)).  The mere existence of a scintilla of evidence in support of the non-movant's position is insufficient; rather, there must be evidence on which the jury could reasonably find for the non-movant.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  Moreover, a genuine issue of material fact cannot rest on "mere speculation, or building one inference upon another."  *Casey*, 823 F. Supp. 2d at 349.

Additionally, summary judgment shall be warranted if the non-moving party fails to provide evidence that establishes an essential element of the case.  The non-movant "must produce competent evidence on each element of his or her claim."  *Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 671 (D. Md. 1999).  If the non-movant fails to do so, "there can be no genuine issue as to any material fact," because the failure to prove an essential element of the case "necessarily renders all other facts immaterial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *see also Casey*, 823 F. Supp. 2d at 348-49.  In ruling on a motion for summary judgment,

a court must view the facts and inferences "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

## III.    ANALYSIS[1]

### a.   Bioiberica Nebraska's Summary Judgment Motion

Some basic background on this case's procedural history is required for context before examining Bioiberica Nebraska's summary judgment motion. Bioiberica Nebraska has repeatedly sought to amend its pleadings over the course of this litigation, each time significantly altering its legal theories or, in some cases, attempting to return to prior theories already rejected by the Court. After extensive briefings on various motions to dismiss and motions to amend, during which this Court expressed increasing skepticism with Bioiberica Nebraska's ever-shifting grounds for suit, the Court ultimately allowed Bioiberica Nebraska to proceed on a single theory articulated in its Third Amended Complaint ("TAC"): novation. *See* ECF 49, 50. Under that theory, Bioiberica Nebraska would have to prove that Nutramax intended to extinguish its existing contract with Bioiberica S.A.U. to enter into an entirely new contract with Bioiberica Nebraska. Following that decision, Bioiberica Nebraska made one final attempt to amend its complaint on the basis of apparently newly discovered information—an invoice from Bioiberica Nebraska sent to Nutramax for the purchase price of the *original* shipment of the Product to Nutramax, which included the

---

[1] The Court notes, first, that this case is functionally a proxy dispute in a larger trade clash between the parties playing out in the International Court of Arbitration. *See* ECF 86-10 at 7 n. 2; ECF 87-1 at 5. While that separate dispute lies far beyond the scope of this opinion, the Court notes with disapproval the extended gamesmanship and dilatory tactics both sides have engaged in, seemingly as a result of this other disagreement. Those tactics—and, in particular, Bioiberica Nebraska's insistence on repeatedly concocting new legal theories while simultaneously failing to investigate the basic facts of its case—have extended this litigation for almost three years, despite the fact that the core facts of the dispute have been in the parties' control from the very start. The parties have wasted extensive judicial and client resources on a basic contract dispute that could, and should, have been resolved by this Court far earlier.

relevant late fee and costs provision it now seeks to enforce here.  ECF 60.  This incredibly delayed revelation (despite the invoice having been in Bioiberica's possession the entire time) meant that Bioiberica Nebraska would no longer have to rely on a theory of novation.  The newly proposed theory relied on the invoice sent to Nutramax in connection with the *very first* shipment rather than a subsequent one, meaning there would be no need for novation, or assignment, or delegation, or any of Bioiberica Nebraska's prior theories, if the invoice with the late fee and costs terms was included from the start.  However, the Court did not grant this fourth motion to amend, citing the extensive delay in uncovering the newfound invoice, deeming the belated discovery and subsequent attempt to amend to be "bad faith" in the context of Bioiberica Nebraska's chosen course of litigation as a whole.  ECF 84.

None of the foregoing has deterred Bioiberica Nebraska from now entirely eschewing the sole theory in its TAC, novation, instead opting to pursue the theory the Court rejected in denying its fourth attempt to amend.  "The question of whether a novation occurred is irrelevant," Bioiberica Nebraska asserts, ECF 86-10 at 22—a bold conclusion given the thoroughly litigated nature of the pleadings leading to the novation theory's survival as well as this Court's unequivocal rejection of the presently revisited theory as "bad faith."  Its justification for this departure from the TAC is that Fed. R. Civ. P. 15(b) authorizes amendments to pleadings during and after trial where facts proven at trial differ from those in a complaint and thus support a cause of action not originally pled.  ECF 90-3 at 15-21.  While Bioiberica Nebraska accurately points out that the Fourth Circuit has extended Rule 15(b)'s rationale to summary judgment in some contexts, those decisions relied upon a two-pronged rationale inapplicable here: first, that the new facts and arguments presented on summary judgment effectively moved the district court for leave to amend, and second, that the district court appeared willing to grant that motion.  *See People for Ethical*

*Treatment of Animals v. Doughney*, 263 F.3d 359, 367–68 (4th Cir. 2001) ("Here, PETA's summary judgment briefs essentially moved the district court for leave to amend its complaint to include an ACPA claim, and the district court appears to have granted that motion via its summary judgment ruling."). Here, however, this Court already rejected a proposed amended complaint putting forth precisely this same series of arguments. While Rule 15(b) may allow new causes of action to be validly argued on summary judgment where the new cause of action in question could appropriately be added to the complaint via amendment, the Court has previously concluded that the TAC may *not* appropriately be amended to include the theory Bioiberica Nebraska now espouses. *See* ECF 73, 84. Bioiberica Nebraska's approach, then, does not "essentially move[] the district court for leave to amend," but rather attempts an end run around the Court's earlier denial of leave to amend on this precise issue. Such a suspect strategy is plainly not within the scope of Rule 15(b) or the Fourth Circuit's expansion of that rule to summary judgment.

Bioiberica Nebraska's decision to entirely ignore novation in favor of an inappropriate attempt to revive claims this Court already rejected is sufficient grounds to deny its motion outright, since it proffers no affirmative summary judgment argument as to the sole operative claim in this case. However, in light of this case's long, tortured history and in the interest of giving it a thorough, final resolution, it is worth examining Bioiberica Nebraska's proffered theory on the merits, too. It outlines two different arguments for why the terms of the newly-discovered invoice, sent in connection with Bioiberica S.A.U.'s first shipment to Nutramax, should govern. First, Bioiberica Nebraska suggests the invoice was a counteroffer to Nutramax's purchase order, such that its terms constituted the entire contract once Nutramax accepted the shipment to which the invoice was related. ECF 86-10 at 12-14. Alternatively, it argues that the invoice added new terms to the underlying Bioiberica-Nutramax contract via Md. Code Ann., Com. Law § 2-207(2), under

which additional terms included in a merchant's acceptance of an offer become part of the contract unless certain exceptions are met. *Id.* at 14-20. Both of these theories are unpersuasive.

### i.  The Invoice as Counteroffer

The Court has already rejected facets of Bioiberica Nebraska's "invoice as counteroffer" theory in its prior decisions. In particular, the Court dismissed Bioiberica Nebraska's now-revived assertion that the shipment did not constitute acceptance because the Purchase Order Terms & Conditions strictly required acceptance in writing returned via facsimile.[2] *See* ECF 49. While there is a term in the Purchase Order allowing for written acceptance, the Court concluded that shipment via acceptance was both authorized by Maryland law *and* expressly contemplated by the Purchase Order:

> Bioiberica S.A.U.'s shipment of the requested material, in direct response to Nutramax's Purchase Order, constituted acceptance of the terms of the Purchase Order. *See Audio Visual Assocs., Inc. v. Sharp Elecs. Corp.*, 201 F.3d 254, 250 (4th Cir. 2000) (explaining that, under Maryland law, a purchase order acts as an offer, and a seller can accept the purchase order "by performance and delivery of the goods."). Moreover, the Purchase Order expressly contemplates the possibility that shipment might be made in response to the Purchase Order in the absence of written acceptance. ECF 1-1 at 6.

ECF 49 at 3. The newly discovered Bioiberica Nebraska invoice, delivered to Nutramax in connection with this initial shipment, does not alter this conclusion. As Bioiberica Nebraska's own brief points out, an acceptance of an offer for a sale of goods that includes additional terms is not construed as a counteroffer but rather as a full-fledged acceptance where the additional terms

---

[2] The parties dispute, additionally, whether an earlier acceptance occurred when Bioiberica S.A.U. replied via email to Nutramax's Purchase Order "confirming the deliveries for your new [Purchase Order]" and listed out the dates of estimated delivery of the three requested shipments. ECF 87-5 at 2; *see also* ECF 87-1 at 9 (asserting that this email confirming shipping constituted acceptance)' ECF 90-3 at 3 (terming the email an acknowledgement that Bioiberica S.A.U. could deliver the Product in the time requested, rather than a writing returned by facsimile that would constitute acceptance). The somewhat vague email confirmation would appear to create a dispute of fact as to when formation occurred, but resolution of any potential dispute on this front is not material because even if Bioiberica Nebraska's preferred view is adopted (i.e. acceptance and/or counteroffer did not occur until shipment), its summary judgment argument still fails.

are viewed as "proposals for addition to the contract." *See* Md. Code Ann., Com. Law § 2-207(2). While the Bioiberica Nebraska invoice did explicitly purport to reject any potential purchase order terms, the record suggests that this invoice was sent subsequent to the shipment of the Product, which served to create the contract. *Compare* ECF 87-9 at 2 *with* ECF 87-8 *and* ECF 86-12 ¶ 13 (indicating that the invoice was received by Nutramax on January 17, 2018, whereas the shipment was sent from Bioiberica S.A.U. in late 2017 for delivery on January 4, 2018[3]); *see* Md. Code Ann., Com. Law § 2-206(1)(b) (stating that "the prompt . . . shipment of conforming or nonconforming goods" constitutes acceptance); § 3:9 The Law of Sales Under the UCC (where an invoice for shipped goods purports to be a counteroffer, "[t]he proper inquiry [is] whether the goods were shipped by the seller before the invoice was received by the buyer."). As such, any attempted rejection via the invoice terms was futile in light of Bioiberica S.A.U.'s previous acceptance by virtue of its sending of the shipment.[4] Thus, Bioiberica validly accepted Nutramax's Purchase Order, along with its attendant Terms & Conditions, as this Court previously concluded. The recently unearthed initial invoice did not change the fact of this acceptance, but at best served only to propose additional terms to be included in the contract. Whether that proposal was accepted by Nutramax requires a separate analysis, carried out below.

---

[3] While the record does not clearly indicate the precise date when the first installment was shipped, it is clear that Bioiberica S.A.U. sent it some time prior to the January 17, 2018 invoice date. An affidavit submitted by Bioiberica Nebraska suggests that the initial shipment was sent "to arrive at Nutramax's facility . . . by January 4, 2018." ECF 86-12 ¶ 13. Indeed, logic dictates that a shipment, particularly an international one that must clear customs, would be shipped many days prior to its delivery date. Thus, despite the lack of a clearly specified date of shipment, the Court has little difficulty concluding that such shipment definitely occurred at some point prior to Nutramax's receipt of the January 17, 2018 delivery and accompanying invoice.

[4] The invoice's own terms further specify that it does not apply where there exists a prior written agreement, which would apply here as explained in Section III(a)(ii), *infra*.

### ii.  The Invoice as Acceptance with Additional Terms

Md. Code Ann., Com. Law § 2-207(2) provides the following:

(2) The additional terms [of an acceptance] are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

> (a)  The offer expressly limits acceptance to the terms of the offer;
>
> (b)  They materially alter it; or
>
> (c)  Notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

Nutramax, Bioiberica Nebraska, and Bioiberica S.A.U. are all clearly "merchants" within the definition of Md. Code Ann., Com. Law § 2-104(1).  Thus, the analysis turns on whether one of the listed exceptions applies, such that the additional terms did not become part of the contract.

Nutramax's Purchase Order expressly limited acceptance to its own terms, as contemplated by § 2-207(2)(a).  Its Terms & Conditions included the following provision: "Any commercial terms on supplier's acceptance, quote, invoice or other documents or communications are excluded and shall have no force or effect."  ECF 87-4 at 6.  Such unambiguous and unequivocal rejection of additional terms added by the supplier—specifically contemplating such terms included in a supplier's invoice, no less—is inarguably an express limitation on acceptance to the terms of the offer contemplated by § 2-207(2)(a).  Bioiberica Nebraska claims, without reference to any textual support, that "[t]he terms in the Purchase Order restricting amendment do not apply unless the Purchase Order has been first accepted according to its acceptance requirements (i.e. a writing returned by facsimile)."  ECF 86-10 at 16-17.  First, as previously explained, there is nothing in the Purchase Order that requires acceptance via written facsimile in the first place—the written acceptance provision is merely one possible method of acceptance.  Furthermore, there is no clause linking this permissive written acceptance term to the term expressly foreclosing the inclusion of

additional terms via invoice.  The two are entirely separate sentences, with no reference to one another whatsoever.  Bioiberica Nebraska's conclusory assertion to the contrary is unavailing. Nutramax's Purchase Order expressly limited acceptance to the terms of the offer, thus the terms in the Bioiberica Nebraska invoice covering late fees and costs are excluded via § 2-207(2)(a).

It is significant to note, too, that Bioiberica Nebraska's *own invoice* contained language that expressly limited the invoice's application to circumstances where no prior written contact existed between Bioiberica Nebraska and the customer.  ECF 87-9 at 3.  Where a written contract did exist, the invoice stated that "the terms and conditions expressed herein are not intended to modify, change, or supersede such prior contract."  *Id.*  Here, a written contract, namely the Purchase Order and its Terms & Conditions, was formed when Bioiberica S.A.U. accepted its terms via shipment (or, alternatively, when it sent the email confirming the dates of delivery), implicating the language of the Bioiberica Nebraska invoice provision and therefore preventing the invoice's other terms from being added into the pre-existing contract.

Bioiberica Nebraska argues that its invoice's limiting language does not apply because there was no prior written contract between it and Nutramax—the Purchase Order, at best, constituted a written contract between Bioiberica S.A.U. and Nutramax *only* and the invoice provision would only apply to a written contract between Bioiberica Nebraska and Nutramax.  *See* ECF 90-3 at 4 n. 1.  Yet, in the same breath, Bioiberica Nebraska argues its invoice added additional terms to the contract between Bioiberica S.A.U. and Nutramax, or otherwise rejected it and acted as a counteroffer.  *Id.* at 4-5 ("This contract included all of the economic terms of the [Nutramax] Purchase Order . . . and the boilerplate terms of the initial Bioiberica Nebraska invoice . . . .").  It is disingenuous to emphasize the separateness of Bioiberica Nebraska and Bioiberica S.A.U. where convenient, while simultaneously asserting that the former had the ability to

unilaterally add new terms to or reject the latter's contract with Nutramax.  Instead, the Court concludes that the invoice language foreclosing its terms' application to a "prior contract" applies because Bioiberica Nebraska was acting pursuant to that contract by sending the invoice for the Product pursuant to the contract's terms, either on behalf of Bioiberica S.A.U. or as Bioiberica S.A.U.'s assignee—the very sort of rationale Bioiberica Nebraska adopts to argue that the invoice terms apply here.  As such, not only does § 2-207(2)(a) prevent the invoice's terms from being added to the contract as outlined previously, but the plain language of the invoice's own limiting provisions prevents such addition as well.

Because Bioiberica Nebraska has both inappropriately attempted to move for summary judgment on theories previously rejected by this Court and because these theories fail on the merits, its summary judgment motion will be denied.

### b.  Nutramax's Summary Judgment Motion

Nutramax focuses its motion, appropriately, on the novation theory presented in the TAC. While Bioiberica Nebraska fails to affirmatively argue for summary judgment on its operative novation theory and even goes so far as to suggest that it is "irrelevant" and "moot," it does, briefly, argue against granting summary judgment on novation in Nutramax's favor.  As such, analysis of whether a genuine dispute of material fact exists as to novation is required.

Under Maryland law, a novation is "a new contractual relation made with intent to extinguish a contract already in existence."  *E.g.*, *I. W. Berman Props. v. Porter Bros., Inc.*, 276 Md. 1, 7 (1975).  To establish a novation, a plaintiff must establish "(1) [a] previous valid obligation; (2) the agreement of all the parties to the new contract; (3) the validity of such new contract, and (4) the extinguishment of the old contract, by the substitution of the new one." *Leisner v. Finnerty*, 252 Md. 558, 564 (1969) (quoting *Dist. Nat'l Bank of Wash. v. Mordecai*, 133

Md. 419, 427 (1919)).  Maryland courts "never presume[]" that a novation occurred; instead, "the party asserting it must establish clearly and satisfactorily that there was an intention, concurred in by all the parties, that the existing obligation be discharged by the new obligation." *I. W. Berman*, 276 Md. at 8.  The intent need not be express, however, as the facts and circumstances surrounding the transaction, "as well as the subsequent conduct by the parties, may show such an acceptance as clearly as an express agreement." *Leisner*, 252 Md. at 565 (citation omitted).  These requirements have been characterized as "fairly stringent." *Transam. Premier Life Ins. Co. v. Selman & Co., LLC*, 401 F. Supp. 3d 576, 593 (D. Md. 2019) (quoting *Corp Healthcare Fin., Inc. v. BCI Holdings Co.*, No. CCB-05-3391, 2006 WL 1997126, at *7 (D. Md. July 13, 2006)).

Nutramax has successfully demonstrated that there is no genuine dispute of material fact as to novation—the record is devoid of evidence that "clearly and satisfactorily" establishes the parties' intent to discharge the existing obligations under the Purchase Order in favor of the obligations under the Bioiberica Nebraska invoice.  Bioiberica Nebraska has provided no evidence that any of the parties, and in particular Nutramax, ever even discussed or contemplated the idea of replacing the Contract, let alone that they reached an "agreement among the parties to extinguish the old obligation(s) and substitute a new one for it." *Adler*, 245 Md. at 159.  While an agreement or intent to novate may be implied, no such implicit evidence exists here.  Indeed, as explained in Section III(a)(ii), *supra*, the Purchase Order expressly indicated an intent not to extinguish or substitute its terms for later agreements.  ECF 87-4 at 6.  The invoice itself even contained terms suggesting it *would not* impact the existing written obligations of the parties, suggesting that even Bioiberica Nebraska did not have the requisite intent to novate. *See* ECF 86-10 at 16-17.  Nor does the subsequent course of conduct following Nutramax's receipt of the invoice suggest the requisite intent to novate, since its subsequent performance comported with the material terms of the original Purchase Order.

13

Given the high bar of showing novation, this stark lack of evidence of intent is fatal to Bioiberica

Nebraska's novation claim.

   In light of these clear shortcomings, it is perhaps unsurprising that Bioiberica Nebraska, by its

own admission, attempts to sidestep the "typical analysis of whether a novation has occurred."  ECF

90-3 at 10-11.  Instead, it argues that the unique circumstances of this case "eliminate any need for . .

. intent for a novation by the remaining debtor [Nutramax] . . . ." and allowed Bioiberica S.A.U. to

unilaterally novate the contract.  *Id.*  Specifically, Bioiberica Nebraska points out that, at the time of

the filing of this lawsuit, Bioiberica S.A.U. had fully performed its duties under the contract by

delivering all of the Product, whereas Nutramax's full payment for those shipments was still

outstanding.  This, it suggests, gave Bioiberica S.A.U. the right to unilaterally assign its right to collect

the money or damages due to Bioiberica Nebraska pursuant to Md. Code Ann., Com. Law § 2-210(2),

which governs delegations of performance and assignment of rights.  Extrapolating on this assignment

theory, Bioiberica Nebraska asserts that a post-performance assignment of the right to payment should

be considered a novation because the withdrawing party (Bioiberica S.A.U.) would have no further

rights or obligations under the contract since it fully performed (no more obligations) and assigned its

right to payment (no more rights).  Bioiberica Nebraska would step into that void and the terms of its

invoice would control.

   To call the foregoing theory tenuous would be generous.  First and most fundamentally,

Bioiberica Nebraska cites no Maryland case law[5] for its significant logical leap from assignment to

novation and, moreover, fails to explain how this novel argument would comport with the

aforementioned extensive Maryland precedent repeatedly emphasizing the high bar for demonstrating

---

[5] Even Bioiberica Nebraska's out-of-jurisdiction precedent holds true to the same core principles
as Maryland—novation requires proof of the parties' intent to implement a novation.  *See, e.g.*,
*U.S. Bank Nat. Ass'n v. State Bank & Tr. Co.*, 45 F. Supp. 3d 582, 589 (S.D. Miss. 2014);
*Ainsworth v. Lee*, 218 Miss. 813, 818, 67 So. 2d 905, 907 (1953) (requiring evidence of "a mutual
agreement among all parties" to prove a novation).

*both parties'* intent and agreement to novate.  To allow a party to unilaterally novate a contract by assignment simply because it had fully performed its obligations would not only contravene Maryland jurisprudence but would more generally turn contract law on its head, casting any contract not involving simultaneous performance into disarray and uncertainty since the contract's terms could be changed at the drop of a hat via unilateral assignment by the first performer.

Thus, since Bioiberica Nebraska's theory fails and there is no evidence in the record establishing a dispute of material fact as to novation, summary judgment will be granted for Nutramax.

**IV.    CONCLUSION**

For the reasons set forth above, Bioiberica Nebraska's Motion for Summary Judgment, ECF 86, is DENIED.  Nutramax's Motion for Summary Judgment, ECF 87, is GRANTED. Judgment will be entered for Nutramax.  A separate Order follows.


Dated:  August 13, 2021                                      _____/s/_____
                                                            Stephanie A. Gallagher
                                                            United States District Judge